**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| AFOLUSO ADESANYA : <br> 389 Highgate Drive : <br> Ambler, PA 19002 : | CIVIL ACTION |
| : | |
| Plaintiff, : | Docket No.: |
| : | |
| v. : | |
| : | |
| NOVARTIS PHARMACEUTICALS : <br> CORPORATION : <br> 1 Health Plaza : <br> East Hanover, NJ 07936 : | **JURY TRIAL DEMANDED** |
| : | |
| Defendants. : | |

## CIVIL ACTION COMPLAINT

Plaintiff, Dr. Afoluso Adesanya (M.D.) (hereinafter referred to as "Plaintiff"), by and through her undersigned counsel, hereby avers as follows:

### I. Introduction

1.     Plaintiff has initiated this action to redress violations by Defendant of the Family and Medical Leave Act ("FMLA" - 29 U.S.C. § 2601) and the New Jersey Law Against Discrimination ("NJ LAD - N.J.S.A. 10:5-1 *et seq*.). Plaintiff asserts that Defendant unlawfully terminated her employment in violation of these laws and that she suffered damages as sought herein.

### II.     Jurisdiction and Venue

2.     This Court may properly maintain personal jurisdiction over Defendants because Defendants' contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions of fair play and substantial

justice, satisfying the standard set forth by the United States Supreme Court in International Shoe Co. v. State of Washington, 326 U.S. 310 (1945) and its progeny.

3.      This action is initiated pursuant to the FMLA.  The United States District Court for the District of New Jersey has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims arise under laws of the United States. This Court has supplemental jurisdiction over Plaintiff's state-law claim(s) because it arises out of the same common nucleus of operative facts as her federal claim(s).  This Court would alternatively have jurisdiction 28 U.S.C. § 1332 based upon diversity anyway, as the Parties are citizens, domiciliaries, and residents of different states.

4.      Venue is properly laid in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2), because Defendant conducts business in this judicial district and because a substantial part of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district.

### III.    Parties

5.      The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

6.      Plaintiff is an adult female who resides at the above-captioned address.

7.      Defendant Novartis Pharmaceuticals Corporation (hereinafter "Defendant") researches, develops, manufactures and markets leading innovative prescription drugs used to treat a number of diseases and conditions, including those in the cardiovascular, central nervous system, cancer, ophthalmics, organ transplantation and respiratory areas.  Defendant is an affiliate and/or subsidiary of Swiss parent company Novartis AG.  Defendant is based in New Jersey at the above-captioned address.

8.      At all times relevant herein, Defendant acted by and through its agents, servants, and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for the benefit of Defendants.

### IV.      Factual Background

9.      Plaintiff was hired by Defendant in or about late March 2010, particularly on or about March 22, 2010.

10.      Plaintiff was hired for and did in fact work in the position of Senior Brand Safety Leader for Defendant.

11.      Plaintiff was considered to be an employee within Defendant's Integrated Medical Safety Department / Group, and her overall manager during her period of employment was Annick Krebs.

12.      Although Plaintiff's overall departmental / group manager was Krebs, Plaintiff had varying operational managers she reported to over the years who were direct reports to Krebs.

13.      Plaintiff is a medical doctor, and as a Senior Brand Safety Leader for Defendant, she (among other responsibilities):[1]

> a) Was responsible for safety issue management from the formation of medical products through life-cycle management (pre- and post-approval);
>
> b) Was a point person for the strategic leadership and expertise in clinical safety for assigned medicinal products;

---

[1] This paragraph is intended to serve only as a general summary and to provide some examples from an outline standpoint of Plaintiff's responsibilities within Defendant. Plaintiff thus does not specify each and every responsibility herein, and her specific tasks, travel and responsibilities also varied depending on the stage of product development and the assigned products she oversaw at varying times in her employment.

    c) Collaborated on an international scale with industry experts, specialists, and amongst a multitude of branches, divisions, and groups within Defendant's organization and affiliated entities;

    d) Provided expert safety leadership in the development of all relevant aspects of program development strategy;

    e) Used scientific and medical safety leadership to develop effective clinical safety programs to maximize the benefit and minimize risk to patients; and

    f) Served as a leader in the clinical safety agenda for assigned products, including program strategy, documents and labeling, and operated as a liaison and/or point person in providing safety expert responses in communication with health authorities globally.

14. Plaintiff has and continues to suffer from various health conditions and disabilities, which include but are not limited to, neck problems, limitations with her left hand, chronic back problems, dry eyes and acid reflux, some of which worsened during her employment with Defendant. Plaintiff has a long history of treatment for these conditions with appropriate physicians.

15. From the commencement of her employment, Plaintiff regularly worked remotely and typically worked at least 2 days or more per week from home. Plaintiff's job with Defendant did not require on-site work because (among other reasons):

    a) Plaintiff had a home office;

    b) Plaintiff's occasional management meetings were via video conference;

    c) Plaintiff typically had no more than 1-2 global team meetings that were in person per year while in the employ of Defendant;

    d) Plaintiff reported to management that was based internationally (particularly in Switzerland);

    e) Plaintiff collaborated with employees, colleagues, and other personnel all over the world at various times of the day and did not work set hours to accommodate for the many time zones that existed; and

    f) Plaintiff's reports, research, and submissions were typically all done remotely and sent electronically to recipients.

16.    Plaintiff's job was so busy in each calendar year during the timeframe of September and October that for each year Plaintiff was employed with Defendant, she would work 1-2 months in a row remotely during said timeframe often without coming to work during any weeks or sometimes - at most - 1 day per week during this timeframe.

17.    Plaintiff was able to perform her job 100% remotely without any need to come to work at all, although she typically came to work 2-3 days per week during her first couple of years of employment (except for the September / October timeframe when she worked remotely for 1-2 months consecutively as aforesaid).

18.    In 2010, Plaintiff worked approximately half of the work year remotely; and in her annual evaluation for the 2010 year, Plaintiff was identified as meeting or exceeding expectations in every area of her performance.  In multiple areas of her 2010 evaluation, Plaintiff was identified as having a large workload and maintaining same well, with commentary such as:

> [Plaintiff] is very result driven. She is able to manage heavy workload and to meet the expectations in matter of quality and quantity. She is highly committed working long hours and delivering excellent documents.

19.    In 2011, Plaintiff worked approximately half of the work year remotely; and in her annual evaluation for the 2011 year, Plaintiff was identified in summary as fully meeting

expectations. In areas of her 2011 evaluation, Plaintiff was identified as handling her workload very efficiently with commentary such as:

> [Plaintiff] is successfully managing a huge and complex workload. She is very effective in analyzing changes in the regulatory environment and proposing appropriate measures and company positions. Her outputs are delivered timely and at a high quality. [Plaintiff] has the ability to focus when external timelines are imposed on the projects. Thus, she avoids conflicts with other tasks in her portfolio.

20.     Plaintiff did not have concerns with disability discrimination by her management in calendar years 2010 and 2011 (as she had not made requests for medical accommodations during said years).

21.     However, during Plaintiff's last approximate 14 months of employment (mid-2012 through her termination in September 2013) with Defendant, Plaintiff felt that she was being discriminated against due to her health conditions.

22.     In or about the timeframe of May and June of 2012, Plaintiff was communicating with one Megan Burley, a Director of Human Resources. Plaintiff was having complications with her disabilities, and she was generally discussing with Defendant's management and human resources personnel that: (a) she was having exacerbated health problems; (b) needed to work remotely for full weeks at a time periodically; and (c) going forward Plaintiff was requesting - as a medical accommodation - to work 3 to 4 days per week remotely.

23.     For example, on June 20, 2012, Plaintiff informed her management via e-mail that she had "been having some challenges with [her] health lately . . . [she] had a doctor's appointment today and the doctor has restricted [her] activities to not drive for the next week with some therapy and follow-up in one week," stating she "will telecommute till then."

24.     In July of 2012, Plaintiff was advised by Defendant's management, and particularly one Dawn Aubel (a nurse practitioner for Defendant), to "comply with [her] doctor's recommendation" per follow-up e-mail communications.

25.     Due to her health problems through the summer and fall of 2012, Plaintiff was primarily working remotely. Plaintiff's requests to work remotely more often than in the past years was supported by her doctor's recommendations and medical documentation provided to Defendant.

26.     During the second half of 2012 however, Plaintiff was experiencing tremendous animosity from her management (particularly Krebs), which included but was not limited to: (a) being treated in a demeaning and rude manner; (b) having her job threatened; (c) and having her physician(s) contacted about Plaintiff's abilities to perform her job.

27.     During the second half of 2012, Plaintiff was able to perform all essential and non-essential functions of her job, as she: (a) worked remotely (as she always had anyway); (b) was 100% able to perform her job remotely; (c) normally worked almost entirely remotely in September and October of 2012 anyway; and (d) her medical condition primarily inhibited her ability to travel (which was a 2-hour drive to or from work for her), as it was not limiting in Plaintiff's ability to perform any aspect of her actual job duties.

28.     Plaintiff expressed concerns to her local management about disability discrimination she was experiencing to no avail, and she thus escalated her concerns to one Alessandro Riva (Global Head of Development for Defendant) in September of 2012.

29.     On September 9, 2012, Plaintiff sent an e-mail to Riva stating in pertinent part:

    a) Since 2010, she has been assigned to work on products Zometa and Aredia (specific medical products);

b)  She has always met every deadline and has been a strong performer;

c)  She was requesting to commute only 1 day per week and to work 4 days remotely;

d)  That she was told by human resources (Burley) and Defendant's management (Annick) that she is required to work no more than 2 days remotely going forward;

e)  That her medical accommodation requests were not being honored;

f)  That Annick told Plaintiff it is her choice to work or not in light of her health and that her accommodation requests won't be honored; and

g)  That Defendant's actions have made her work environment hostile.

30.     Plaintiff was escalating her complaint of discrimination to Riva in September of 2012 because she was being grossly mistreated as a result of seeking a very reasonable accommodation (being able to work remotely and extra day or 2 per week more than in the past).

31.     On September 10, 2012, Riva responded via e-mail to Plaintiff acknowledging receipt of her "note," confirmed he would communicate with Plaintiff's management, and advised "[w]e will keep you updated."

32.     After receiving the September 10, 2012 e-mail from Riva, Plaintiff was never e-mailed, called, or talked to again by Riva who thereafter did not follow up or "update" Plaintiff on her September 2012 complaint of discrimination to him.

33.     Even though Plaintiff's medical accommodation requests were very reasonable, she was not even seeking some exception to the general rule(s) of Defendant, as: (a) she had worked remotely for years; and (b) many of Defendant's employees worked remotely (other than Plaintiff).

34.     In September and October of 2012, Plaintiff was permitted to work primarily remotely as she customarily had been over the years because this time of year was so tremendously busy and often required Plaintiff to work 15-20 hours per day to complete exceedingly complex work under very pressuring deadlines.

35.     In or about October of 2012, Plaintiff was informed by Defendant's management that her responsibilities in overseeing the products Zometa and Aredia were going to end and that she was being transitioned to oversee MEK 162 and LGX 818, other significant medical products manufactured by Defendant.

36.     Plaintiff's workload was significantly increased at the end of 2012, as she had to oversee 4 products instead of 2 products until Zometa and Aredia were finally transitioned elsewhere after several months of overlapping work.

37.     While Plaintiff's work was to be transitioned to different products, her general responsibilities, analysis, collaboration, and overall job duties remained the same. She however had to spend an inordinate amount of time working while overseeing 4 products instead of just 2 during said period of time.

38.     Because Plaintiff's accommodation requests were not being honored and because Plaintiff was told that she would be terminated if she did not work at least 3 days within Defendant's office and only work 2 days remotely per week, from in or about early 2013 through her termination, Plaintiff did in fact comply with Defendant's ultimatum and work 3 days in-office and only 2 days remotely per week.

39.     Aside from Defendant's unwillingness to honor Plaintiff's requests for accommodations, its animosity exhibited towards Plaintiff due to her health needs, and Plaintiff's

complaints of disability discrimination in the second half of 2012, Plaintiff still performed her job in an exceptional manner throughout 2012.

40.    In 2012, Plaintiff worked approximately two thirds (2/3) of the work year remotely; and in her annual evaluation for the entire 2012 year, Plaintiff was identified in summary as fully meeting expectations. She received fully meets expectations as a rating in every ratable category as to her 2012 annual evaluation. Not once for the year 2012 was Plaintiff rated as needing improvement in any area of her performance

41.    As to written commentary, in her 2012 performance evaluation, Plaintiff was identified as having: "a huge expertise," level of "experience," having necessary "competence," being "very committed and disciplined," being "very loyal," and separately it was commented:

> [Plaintiff] provided good and timely support to regulatory activities for Zometa and Aredia. [Plaintiff] represents Novartis very well with the quality approach and the skills she has in preparing regulatory documents.

42.    Plaintiff was presented with her fully meets expectations 2012 annual evaluation in March of 2013, at which time she received her bonus letter from Krebs that her bonus was cut by five percent (5%) despite that there was no rationale for same and despite that Plaintiff's performance was as good or better than her prior year (in which she received no bonus cut).

43.    The trimming of Plaintiff's 2012 annual bonus was discriminatory and/or done in retaliation for her complaints of discrimination made in the preceding months.

44.    Defendant also implemented a policy of flex time; but when Plaintiff inquired and applied for same in the January 2013 timeframe, she was denied immediately.

45.    On or about March 15, 2013, Plaintiff attempted once again to reach out to Riva (Global Head of Development for Defendant), and she wrote an e-mail to him stating in pertinent part:

a) She was experiencing a hostile work environment;

b) Her work environment has been hostile since she complained of discrimination in September of 2012;

c) That Krebs is making false statements about her;

d) That Krebs has failed to honor continued accommodation requests;

e) That Krebs has inappropriately discussed Plaintiff's health problems at meetings; and

f) She requested again that Riva become involved with helping resolve the hostile work environment.

46.     Riva responded to Plaintiff that her concerns are being taken "very seriously" and that he was going to have Valerie Acito (Global Head of Human Resources for Defendant) contact Plaintiff.

47.     Plaintiff was scheduled to meet with Acito on or about March 22, 2013; and in advance of the meeting, Plaintiff forwarded multiple e-mail attachments to Acito for review along with her expressed hope to have a "productive meeting."

48.     Plaintiff in fact met with Acito in person on March 22, 2013, expressed concerns of discrimination, and Plaintiff forwarded additional information to Acito thereafter even through early April 2013. Plaintiff was later contacted by Denise Konopka (Associate Director Employee Relations.

49.     Between March and April 2013, Plaintiff expressed to Acito and other management of Defendant that she had been a well-performing employee but that she was really upset she continued to experience discriminatory and retaliatory treatment due to her disabilities,

requested accommodations, and complaints of discrimination (primarily about Krebs' treatment of her).

50.     On June 19, 2013, Plaintiff sent an e-mail asking for any sort of update from Konopka and Acito, as she had as of this time expressed her concerns of discrimination and retaliation nearly 3 months earlier and was told they would be promptly investigated when the complaints were initially made.

51.     Much like Plaintiff's first complaint to Riva in September of 2012, he failed to follow up directly with Plaintiff after her second complaint of discrimination and retaliation to him in March of 2013.  He thus ignored his responsibility as a high-level manager to engage in any follow up with her regarding her concerns, complaints, or the outcome of an investigation.

52.     Instead, nearly 4 months after Plaintiff attempt to again complain of discrimination and retaliation in late March of 2013, Plaintiff was finally contacted by Konopka in July of 2013.  Plaintiff was merely informed via e-mail on July 25, 2013 by Konopka that her concerns have been "thoroughly investigated and are now considered closed." The e-mail from Konopka further stated that Plaintiff's concerns were "not substantiated" and that "for confidentiality reasons, we are not at liberty to discuss any details about the investigation."

53.     Thus, although Defendant is a large, international and sophisticated company:

   a)  Plaintiff had her complaints of discrimination entirely ignored by Riva, the head of Global Head of Development for Defendant) from September of 2012 until March of 2013 when Plaintiff again attempted to complain of discrimination;

12

b) Plaintiff had her complaints of discrimination and retaliation ignored by Riva again after March of 2013 because Riva directed Acito to consider Plaintiff's complaints without ever following up with Plaintiff;

c) Plaintiff complained in March of 2013 about discrimination, retaliation, and being subjected to a hostile work environment - and astonishingly - Konopka elected to take 4 months to even respond to Plaintiff's concerns until July of 2013; and

d) Plaintiff was absolutely given no feedback whatsoever in July of 2013 about her complaints of discrimination and retaliation or how to even remedy her workplace concerns except to be told that everything is confidential, not substantiated and that she is reminded "to keep this matter confidential" - all in a generic e-mail.

54. Defendant's handling of Plaintiff's legitimate concerns was negligent and completely non-compliant with any expectation of a prompt resolution of discrimination or retaliation concerns by an employee (at whatever level he or she may be employed).

55. In July and August of 2013, Plaintiff was being nitpicked continuously about providing work that was not previously required of her, being reminded to be at work, being told she was not at work merely because management did not see her at her desk when in fact she was at work and in meetings or conference rooms, and she was experiencing many other types of hostility and animosity.

56. Plaintiff was abruptly terminated without notice by Defendant on or about September 4, 2013 and told she was not at the office enough and was being terminated for this reason despite that she: (a) was never given discipline during her years of employment; (b) came

to work as directed by Defendant even though her requests for accommodations were ignored; (c) was not given any sort of performance improvement plan or probation; (d) had good annual evaluations; and (e) was present at work more in her last 6 months of employment (as opposed to working remotely) than she had normally worked in prior years without concern.

57.    Despite being terminated for an alleged performance concern, Plaintiff was offered unsolicited severance pay (contrary to Defendant's own policies) if she agreed to waive her legal claims against the company for discrimination and retaliation.[2]

### First Cause of Action
### Violations of the New Jersey Law Against Discrimination ("NJ LAD")
### ([1] Discrimination; and [2] Failure to Accommodate)

58.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

59.    Plaintiff was terminated by Defendant because of her actual or perceived disabilities, due to her record of impairment, and she was denied reasonable accommodations during her last approximate year of employment (including the ability to work remotely as frequently as she requested and which was medically supported).

60.    These actions as aforesaid constitute violations of the NJ LAD.

---

[2] See e.g. *Staffieri v. Northwestern Human Servs.*, 2013 U.S. Dist. LEXIS 72115 at **14-15 (E.D. Pa. 2013)(an employer who offered severance when policies did not require upon condition of waiving FMLA claim supported finding of pretext in FMLA claim among other facts); *See also Bartlett v. NIBCO Inc.*, 2011 U.S. Dist. LEXIS 28072 (N.D. Ind. 2011)("Severance pay packages contingent upon a release of claims which are offered contemporaneously with the notice of termination are *not* covered by [Rule 408]", and the motive in offering same is admissible evidence in a retaliation claim and is admissible at trial in this case); *Karl v. City of Mountlake Terrace*, 2011 U.S. Dist. LEXIS 59085 (W.D. Wash. 2011)(severance agreements are admissible in retaliation claims when made contemporaneous to termination, as they are not governed by FRE 408); *EEOC v. Republic Servs., Inc.*, 640 F. Supp. 2d 1267 (D. Nev. 2009)(denying summary judgment and considering as evidence in wrongful termination case that a company would offer severance when an employee is supposedly terminated in a manner that doesn't warrant severance per an explicit company policy).

**Second Cause of Action**
**Violations of the New Jersey Law Against Discrimination ("NJ LAD")**
**(Retaliation)**

61.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

62.    Plaintiff requested medical accommodations and specifically complained of disability discrimination.

63.    Plaintiff's termination from Defendant due to her requests for medical accommodations and/or complaints of discrimination constitute violations of the NJ LAD.

**Third Cause of Action**
**Violations of the Family and Medical Leave Act ("FMLA")**
**(Interference & Retaliation)**

64.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

65.    Plaintiff was a full-time employee of Defendant, worked more than 1 year, and Defendant employed at least 50 employees within 75 miles of its Hanover, NJ location wherein Plaintiff was considered based.

66.    Defendant committed interference and retaliation violations of the FMLA by:

   a) Not properly giving Plaintiff notice of her FMLA rights;

   b) Attempting to chill and/or dissuade Plaintiff from utilizing FMLA;

   c) Failing to designate Plaintiff's need for reduced schedule and/or intermittent leave as FMLA qualifying;

   d) punishing Plaintiff for taking intermittent FMLA-qualifying leave; and

   e) by terminating Plaintiff to prevent her from taking FMLA-qualifying leave, because she took FMLA-qualifying leave and/or because she

exercised or attempted to exercise her FMLA rights by requesting FMLA qualifying time off from work.

**WHEREFORE**, Plaintiff prays that this Court enter an order providing that:

A.     Defendant is to be prohibited from continuing to maintain its illegal policy, practice, or custom of discriminating/retaliating against employees based on their medical leave needs and is to be ordered to promulgate an effective policy against such discrimination and to adhere thereto;

B.     Defendant is to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to back pay, front pay, bonuses and medical and other benefits.  Plaintiff should be accorded those benefits illegally withheld from the date she first suffered discrimination/retaliation at the hands of Defendant until the date of verdict;

C.     Plaintiff is to be awarded liquidated or punitive damages as permitted by applicable law in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious and outrageous conduct, and to deter Defendant from engaging in such misconduct in the future;

D.     Plaintiff is to be accorded any and all other equitable and legal relief as the Court deems just, proper, and appropriate (including but not limited to damages for emotional distress / pain and suffering - where legally permitted);

E.     Plaintiff is to be awarded the costs and expenses of this action and reasonable legal fees as provided by applicable federal and state law;

F.    Any verdict in favor of Plaintiff is to be molded by the Court to maximize the financial recovery available to Plaintiff in light of the caps on certain damages set forth in applicable federal law;

G.    Plaintiff's claims are to receive a trial by jury to the extent allowed by applicable law. Plaintiff has also endorsed this demand on the caption of this Complaint in accordance with Federal Rule of Civil Procedure 38(b).

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By:    

Ari R. Karpf
3331 Street Road
Two Greenwood Square
Suite 128
Bensalem, PA 19020
(215) 639-0801

Dated: September 19, 2013

17